PATROLMAN "X," Appellant,

v.

CITY OF TOLEDO et al., Appellees.

[Cite as *Patrolman "X" v. Toledo* (1999), 132 Ohio App.3d 374.]

Court of Appeals of Ohio,
Sixth District, Lucas County.

No. L–98–1174.

Decided Feb. 26, 1999.

376

*Jenelda E. Witcher,* for appellant.

*Edward M. Yosses* and *Robert G. Young,* for appellees.

---

MELVIN L. RESNICK, Judge.

This is an appeal from two judgments of the Lucas County Court of Common Pleas. Appellant, Patrolman X, appeals the trial court's grants of summary judgment on some of his claims filed against appellees, the city of Toledo ("city") and James W. Weigand, and the directed verdict on his remaining claims against the city only. For the following reasons, we affirm the trial court's judgments.

Patrolman X sets forth the following assignments of error:

"I. The trial court's summary judgment ruling was an abuse of discretion and prejudicial error as contrary to law and against the manifest weight of the evidence, when it granted the defendants [*sic*] motion for summary judgment on all claims except for authorized disclosures to the Blade of rapsheets [*sic*] or confidential law enforcement investigatory records from the plaintiff's background file.

"II. The trial court's grant of the motion of the defendant for directed verdict was an abuse of discretion and harmful error, as it was against the manifest weight of the evidence.

"III. The delay and numerous irregularities of the trial in the court below was an abuse of discretion and harmful error.

"IV. The directed verdict judgment entry of the trial court was an abuse of discretion and overbroad in its statement of the facts to the prejudice of the plaintiff."

In his Assignment of Error No. I, appellant contends that the trial court erred in granting summary judgment to appellees on some of or, in the case of James Weigand, all of his claims.

The facts of this case are fully set forth in the common pleas court's well-reasoned opinions granting summary judgment to appellees. See Appendices A and B. On March 31, 1995, the trial court granted a motion for summary judgment on all claims, except one, against James Weigand. On April 22, 1996, the court granted the city's summary judgment motion as to most of the issues raised in appellant's claims and on the remaining claim alleged against James Weigand. Upon a thorough review of appellant's arguments in Assignment of Error No. I, the record of this case, the judgments of the court and the law applicable to this case as contained in the court's opinions, we hereby adopt the trial court's judgments of March 31, 1995 and April 22, 1996 as our own. See Appendices A and B. Accordingly, appellant's Assignment of Error No. I is found not well taken.

In Assignments of Error Nos. II and IV, Patrolman X contends that the trial court committed reversible error in granting the city's motion for a directed verdict.

Pursuant to Civ.R. 50(A)(4), a motion for directed verdict may be granted when "the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party, the court shall sustain the motion and direct a verdict for the moving party as to that issue."

Thus, the standard for a trial court to grant a directed verdict is whether sufficient material evidence on a particular issue was presented at trial to create a factual question for the jury. *Ruta v. Breckenridge–Remy Co.* (1982), 69 Ohio St.2d 66, 67–68, 23 O.O.3d 115, 115–116, 430 N.E.2d 935, 936–937.

In the case before us, appellant elected to request only parts of the trial transcript. These transcripts include the discussion on the city's motion for a directed verdict, the testimony of only three of the witnesses (the testimony of Patrolman X at trial is not included), a hearing on a motion to quash, and the court's instructions to the jury just after the jury was sworn in. From these transcripts, we are unable to even ascertain all of the exhibits that were entered into evidence trial.[1]

It is appellant's duty to provide this court with those parts of the record necessary for a resolution of his assignments of error. *Knapp v. Edwards Laboratories* (1980), 61 Ohio St.2d 197, 199, 15 O.O.3d 218, 219–220, 400 N.E.2d 384, 385. Here, Patrolman X was required to order most, if not all, of the

---

1. Appellant cites, on numerous occasions, deposition testimony. Absent any record showing that these depositions were admitted into evidence at trial or read into evidence at trial, the trial court and this court cannot consider the deposition testimony as "evidence" on a Civ.R. 50(A)(4) motion.

transcript of the trial so that we could determine whether substantial material evidence was presented at trial on appellant's remaining claims against the city to create a factual issue for the jury to decide. See *Hickey v. Hancock–Wood Elec. Coop., Inc.* (Aug. 18, 1995), Wood App. No. WD–94–112, unreported, 1995 WL 490961. Because Patrolman X cannot demonstrate the alleged error in the record, we must presume the regularity of the proceedings below and assume that the trial court's grant of a directed verdict was based on submitted evidence, viewed in a light most favorable to appellant, upon which reasonable minds could only reach a conclusion adverse to appellant. *Hartt v. Munobe* (1993), 67 Ohio St.3d 3, 7, 615 N.E.2d 617, 621. Therefore, appellant's Assignments of Error Nos. II and IV are found not well taken.

In Assignment of Error No. III, appellant asserts that irregularities occurring at trial substantially prejudiced his case. Again, appellant failed to order a complete transcript of the trial; thus, it is very difficult for this court to undertake an adequate review of this issue.

Appellant first argues that, due to the nature of this case, he was placed in the "untenable" position of attempting to gather testimony from agents of the city. A review of what little witness testimony is before this court discloses that appellant was permitted to cross-examine and impeach these witnesses on all relevant matters. We can find no irregularity prejudicial to appellant in the transcript of this testimony.

Appellant next contends that the tardiness of one witness, Carleton S. Finkbeiner, was prejudicial to his case. The transcript ordered does not reflect a delay in the proceedings on November 13, 1997, the date Finkbeiner testified. Further, the transcript fails to show an objection to this witness's alleged tardiness. "Failure to timely advise a trial court of possible error, by objection or otherwise, results in a waiver of the issue for purposes of appeal." *Goldfuss v. Davidson* (1997), 79 Ohio St.3d 116, 121, 679 N.E.2d 1099, 1103. Moreover, appellant fails to argue the merits of this contention. Instead, he appears to argue that Finkbeiner's trial testimony was in conflict with his previous deposition testimony. In such an instance, it was incumbent on appellant to use Finkbeiner's deposition testimony for impeachment purposes at trial. Thus, this argument does not go to any "irregularity" in the court proceedings.

Patrolman X next argues that his case was prejudiced because Lawrence Moreland, one of the witnesses subpoenaed to testify at trial, did not appear. We must once again note that there is nothing in the record of this case indicating that appellant took any steps to compel Moreland's attendance at trial. Indeed, and despite the fact that the city states the issue was discussed, there is nothing in the abbreviated record on appeal to show that appellant even objected to Moreland's failure to appear. Therefore, he waived any right to raise the alleged error.

 Finally, appellant asserts that questions of credibility of the witnesses required that the case be decided by a jury. This case was resolved under the standard set forth in Civ.R. 50(A)(4). Therefore, the question before the court was " 'a question of law; that is, the legal sufficiency of the evidence to take the case to the jury. This does not involve weighing the evidence or trying the credibility of witnesses.' " *Wagner v. Roche Laboratories* (1996), 77 Ohio St.3d 116, 119, 671 N.E.2d 252, 255, quoting *Ruta v. Breckenridge–Remy Co.,* 69 Ohio St.2d at 68–69, 23 O.O.3d at 116–117, 430 N.E.2d at 937–938. The court's judgment entry reflects that the court applied the proper standard and did not assess the credibility of the witnesses. The use of the correct standard cannot be deemed an "irregularity" in the proceedings below.

For all of the foregoing reasons, appellant's Assignment of Error No. III is found not well taken.

The judgments of the Lucas County Court of Common Pleas are affirmed. Patrolman X is ordered to pay the costs of this appeal.

*Judgments affirmed.*

HANDWORK, P.J., and PIETRYKOWSKI, J., concur.

## APPENDIX A

### IN THE COURT OF COMMON PLEAS OF LUCAS COUNTY, OHIO

Patrolman X, Plaintiff,

vs.

City of Toledo et al., Defendants.

Case No. CI94–2884

### OPINION AND JUDGMENT ENTRY

CHARLES J. DONEGHY, Judge.

This case arises out of claimed illegal disclosures of personal information relating to the plaintiff, Patrolman X, ("the plaintiff"). These alleged disclosures were made by the defendants, the City of Toledo ("the City") by and through its police department (the "Police Division"), Police Division Captain James Weigand ("Captain Weigand"), and John and Jane Doe (who are unknown employees or officers of the City). The plaintiff is a police officer with the Police Division.[1] The case is now before the Court upon the motion for summary judgment filed by

---

1. The plaintiff brought this action under a fictitious name, "Patrolman X," in order to protect his true identity.

the City and Captain Weigand. Upon review of the pleadings, memoranda of counsel, evidence, and applicable law, the Court finds that it should grant the motion in part and deny it in part.

## I. STATEMENT OF THE CASE

In 1990, pursuant to an order issued by the United States District Court for the Northern District of Ohio, the City established a selection and hiring process ("the selection process") designed to increase the number of women and minority cadets entering the Police Division's December 1990 academy class. The City received over two thousand applications for the forty 1990 cadet positions. Slightly over fifteen hundred candidates passed the civil service exam. The selection process then excluded candidates who had criminal convictions, failed physical and/or psychological testing, and who had no high school diploma or equivalency degree. The City then conducted background investigations into the remaining approximately two hundred candidates and assessed "negative background points" for past incidents including traffic violations and discipline or termination from prior employment. In early December 1990, the City placed in the class all sixteen of the remaining minority candidates who had between zero and twelve negative background points assessed against them. The City filled the remaining positions in the class with twenty-four non-minority candidates. The City selected this latter group by a lottery drawing from the remaining pool of approximately one hundred candidates who had zero to twelve negative background points. The City notified the selectees on or around December 4, 1990 by letter. The class was scheduled to begin police academy training on Friday, December 14, 1990. The plaintiff was one of the sixteen minority candidates included in the class.

After the forty class members were selected, but before the selections were made public, background information regarding some of the class members was leaked by undetermined sources. A notable public controversy then arose over the selection process in part because of the leaked information. Some of the unsuccessful candidates and other private citizens, who were skeptical about the fairness of the selection process and the ultimate quality of the cadets in the 1990 class, expressed their concerns to members of the Police Division, to members of City Council, and to members of the Mayor's Task Force on Law Enforcement ("Mayor's Task Force").[2] Rumors quickly began to spread that at least three of

---

**2.** The Mayor's Task Force was established early in the summer of 1990 to make recommendations to City Council on how to improve the effectiveness of the Police Division and the ethical standards of its members. The Mayor's Task Force was formed after a series of newspaper articles, printed by The Toledo Blade Company ("The Blade"), brought to the public's

the cadets ("the three candidates") had grave incidents in their backgrounds or other impediments that called into question their abilities to become competent police officers. While he was never mentioned by name, the allegations against one of the candidates matched with items in the plaintiff's background.[3]

On December 12, 1990, Thomas Hoover, then the City's manager, ordered that the three candidates would not be entering the police academy with the rest of the class on December 14, 1990. He made that decision to allow the City time to further investigate the emerging controversy over the three candidates' backgrounds. A day later, after discussions with the United States District Court and the law firm known as Advocates for Basic Legal Equality (ABLE),[4] Mr. Hoover rescinded his decision and allowed the three candidates to join the 1990 class as planned.

The Blade published two articles describing the controversy over the selection process, Mr. Hoover's decision regarding the three candidates, and summaries of the alleged incidents or conditions clouding the records of each. Sometime between The Blade's first article on this matter, dated December 13, 1990, and the second, dated January 6, 1991, The Blade apparently obtained at least portions of the three candidates' individual background investigation files compiled and used by the City during the selection process.

The plaintiff asserts that the defendants improperly disclosed private and confidential information about him contained in this background investigation file. He claims that the defendants improperly disclosed information describing three particular criminal reports in which the plaintiff was the suspect. In two separate incidents, occurring in 1986 and 1987 while the plaintiff was serving with the United States Air Force in Arizona, the plaintiff was accused of sexual assault. The plaintiff was never arrested or charged in either incident.[5] (See

---

attention certain "newsworthy" incidents involving police officers who had previously been the subject of investigations by the Police Division's internal affairs department.

**3.** One of the candidates was alleged to have been fired from another law enforcement agency; another was alleged to have been disabled by a back injury and was, thus, unable to ride in a police cruiser; and the plaintiff was allegedly a rape suspect.

**4.** ABLE was the public-interest law firm that obtained the federal court decision ordering the 1990 selection process.

**5.** In the 1986 Arizona incident, the Air Force Office of Special Investigations "disprove[d]" the allegation. In the 1987 Arizona incident, the Arizona municipal law enforcement agency in which the crime report had been filed determined that the alleged incident happened in another jurisdiction. That agency then notified the complainant of the determination, and closed the file. The complainant apparently did not pursue the matter in the proper jurisdiction.

defendants' Composite Exs. C and D, respectively, filed under seal.) In the third incident, the plaintiff was the subject of a Toledo Police Division crime report that indicated he had assaulted a former woman friend in a domestic violence incident; it is unclear whether the plaintiff was arrested or charged in that incident. (See plaintiff's Depo. Ex. 2, filed under seal.)

The plaintiff alleges that the defendants' improper disclosures took the form of unauthorized leaks of the background information which led to widespread rumors, specific identified verbal and written disclosures, and release to The Blade of his background investigation file that contained confidential computer printouts and confidential information regarding the three incidents. The plaintiff contends that as a result of these alleged negligent and intentional disclosures he received harassing treatment from his colleagues and superiors at the police academy and from fellow officers after graduation. He asserts that these disclosures proximately caused him mental anguish, humiliation, and other emotional injuries for which he contends the defendants are liable.

The plaintiff brings this six-count action alleging violations of Ohio and federal statutes and regulations that prohibit certain unauthorized disclosures (first claim); unauthorized publication of confidential information giving rise to a common law claim of invasion of privacy (second claim); deprivation of his right to privacy arising under the United States Constitution in violation of Section 1983, Title 42, U.S.Code (third claim); violation of his substantive and procedural due process rights also arising under the United States Constitution in violation of Section 1983, Title 42, U.S.Code (fourth claim); willful and malicious disclosure of confidential information giving rise to a common law claim of intentional infliction of emotional distress (fifth claim); intentional, willful, wanton and reckless misconduct by the defendants entitling him to punitive damages (sixth claim). The City and Captain Weigand seek summary judgment on all but the sixth claim.[6]

## II. MOTION FOR SUMMARY JUDGMENT STANDARD

In *Harless v. Willis Day Warehousing Co.* (1978), 54 Ohio St.2d 64, 66, 8 O.O.3d 73, 74, 375 N.E.2d 46, 47, the Supreme Court of Ohio stated the requirements that must be met before a Civ.R. 56 motion for summary judgment can be granted:

"The appositeness of rendering a summary judgment hinges upon the tripartite demonstration: (1) that there is no genuine issue as to any material fact; (2) that

---

6. On March 31, 1995, the Court granted Captain Weigand summary judgment on all claims against him except the fifth claim. Captain Weigand now seeks summary judgment on that remaining claim.

the moving party is entitled to judgment as a matter of law; and (3) that reasonable minds can come to but one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made, who is entitled to have the evidence construed most strongly in his favor."

A party who claims to be entitled to summary judgment on the grounds that a nonmovant cannot prove its case bears the initial burden of (1) specifically identifying the basis of its motion and (2) identifying those portions of the record that demonstrate the absence of a genuine issue of material fact regarding an essential element of the nonmovant's case. *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 293, 662 N.E.2d 264, 273–274. The movant satisfies this burden by calling attention to some competent summary judgment evidence, of the type listed in Civ.R. 56(C), affirmatively demonstrating that the nonmovant has no evidence to support his or her claims. *Id.* at 293, 662 N.E.2d at 274. Once the movant has satisfied this initial burden, the burden shifts to the nonmovant to set forth specific facts, in the manner prescribed by Civ.R. 56(E), indicating that a genuine issue of material fact exists for trial. *Id.* Accord *Mitseff v. Wheeler* (1988), 38 Ohio St.3d 112, 114–115, 526 N.E.2d 798, 800–801.

## III. DISCUSSION

### A. FIRST CLAIM—THE CITY'S IMPROPER DISCLOSURES VIOLATED STATUTES AND REGULATIONS

The plaintiff alleges that the improper disclosures violated Ohio and federal statutes. The Court has discovered only two statutes relevant to this case that prohibit unlawful intentional disclosures of certain confidential information stored in government records. See Reechie & Wayland, Ohio's Privacy Act: An Analysis (1978), 10 U.Tol.L.Rev. 159, 159–161. In Ohio, R.C. Chapter 1347, popularly known as "Ohio's Privacy Act," *id.* at 159, protects an individual's right to "informational privacy" by protecting a person's interest in the collection, maintenance, and use of personal information by public institutions, *id.* at 161. The Federal Privacy Act, Section 552a, Title 5, U.S.Code, provides similar protection. *Id.* at 161.

### 1. Federal Privacy Act

Section 552a(g)(1), Title 5, U.S.Code, provides an individual with civil remedies for the improper disclosure of records about the individual that are maintained in a system of records. This subsection permits an individual to bring a civil action in the following manner:

" * * * the individual may bring a civil action against the agency, and *the district courts of the United States shall have jurisdiction in the matters under the provisions of this subsection.*" (Emphasis added.)

Thus, the United States District Court is the forum Congress intended to handle civil actions to redress violations of the Federal Privacy Act. See *Kuffel v. United States Bur. of Prisons* (D.D.C.1995), 882 F.Supp. 1116, 1120, fn. 21. See, also, *Wren v. Harris* (C.A.10, 1982), 675 F.2d 1144, 1147. Thus, the Court finds that it is without jurisdiction to entertain a claim against the defendants brought under Section 552a, Title 5, U.S.Code. Accordingly, to the extent that the plaintiff's first claim asserts a claim based on the Federal Privacy Act, the Court shall *sua sponte* dismiss that claim pursuant to Civ.R. 12(H)(3). See *Beck Suppliers, Inc. v. Dean Witter Reynolds, Inc.* (1988), 53 Ohio App.3d 98, 101, 558 N.E.2d 1187, 1191–1192.[7]

### 2. Ohio's Privacy Act

Ohio's Privacy Act makes a person liable for wrongful disclosures of confidential information as follows:

"A person who is harmed by the use of *personal information* that relates to him and that is maintained in a personal information system may recover damages in a civil action from any person who directly and proximately caused the harm by doing any of the following:

" * * *

"(2) *Intentionally using or disclosing the personal information* in a manner prohibited by law * * *." (Emphasis added.) R.C. 1347.10(A)(2).

The City makes three main arguments in support of its motion for summary judgment. In each the City contends that it is entitled to judgment on this claim as a matter of law.

### a. First Main Argument

The City's first argument is that it is not liable under Ohio's Privacy Act because the documents and information allegedly disclosed from the plaintiff's background investigation file were public records as provided for in R.C. 149.43, Ohio's public records law. R.C. 1347.04(B) states in relevant part as follows:

"*The provisions of [Ohio's Privacy Act] shall not be construed to prohibit the release of public records,* or the disclosure of personal information in public records, *as defined in section 149.43 of the Revised Code* * * *.

"[Such a disclosure] is not an improper use of personal information under this chapter." (Emphasis added.)

---

7. Civ.R. 12(H)(3) reads as follows:

"Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action."

R.C. 149.43(A)(1) reads in pertinent part as follows:

" 'Public record' means any record that is kept by any public office, including, but not limited to, state, county, city, village, township, and school district units, *except* medical records, records pertaining to adoption, * * * *confidential law enforcement investigatory records,* * * * *and records the release of which is prohibited by state or federal law.*" (Emphasis added.) R.C. 149.43(A)(1).

The City asserts that plaintiff's background investigation file and any information or document contained in it are neither "confidential law enforcement investigatory records" nor records that are otherwise prohibited from release. In rebuttal, however, the plaintiff contends that the file contains both types of records.

R.C. 149.43(A)(2) defines a "confidential law enforcement investigatory record" in relevant part as follows:

"[1] [A]*ny record that pertains to a law enforcement matter of a criminal,* quasi-criminal, civil, or administrative *nature,* but [2] *only to the extent that the release of the record would create a high probability of disclosure of* any of the following:

"(a) *The identity of a suspect who has not been charged with the offense to which the record pertains* * * *.*" (Emphasis added.)

In order to determine whether a record is exempted from release under this exception and thus not properly disclosable by the City, the Court is to apply a two-step analysis: "(1) Is the record a confidential law enforcement record? and (2) Would release of the record create a high probability of disclosure of any one of the types of information specified in R.C. 149.43(A)(2)?" *State ex rel. Multimedia, Inc. v. Snowden* (1995), 72 Ohio St.3d 141, 142, 647 N.E.2d 1374, 1377. The Court notes that the person asserting an exemption under the public records law bears the burden to prove the facts warranting the exemption. *State ex rel. Natl. Broadcasting Co. v. Cleveland* (1988), 38 Ohio St.3d 79, 83, 526 N.E.2d 786, 789–790. Any doubt is to be resolved in favor of disclosure. *Id.*

Generally, personnel records relating to public employees are public records unless an exception applies. *Snowden,* 72 Ohio St.3d at 143, 647 N.E.2d at 1377–1378. Items contained in background investigation files regarding police candidates, including investigatory reports compiled by law enforcement agencies to assist in employment decisions, generally are not confidential law enforcement records. *Id.* The phrase in R.C. 149.43(A)(2) "law enforcement matter of a criminal * * * nature" refers directly to the enforcement of the law rather than to "employment or personnel matters ancillary to law enforcement matters." *Snowden* at 143, 647 N.E.2d at 1378, quoting *State ex rel. Lorain Journal Co. v. Lorain* (1993), 87 Ohio App.3d 112, 115, 621 N.E.2d 894, 896. It is clear,

however, that if an item contained in a background investigation file does fall within one of the public records exceptions, it is exempted from disclosure. See *Snowden* at 144–145, 647 N.E.2d at 1378–1379 (certain "medical records," and "rap sheets" containing information derived from computerized criminal data bases are not disclosable with the remainder of the background file).

The plaintiff contends that documents in his background investigation file that relate to the 1986 and 1987 alleged sexual assaults are "confidential law enforcement investigatory records," and any reference to, or disclosure of, these documents was improper. The Court agrees.

Regarding the first prong of the *Snowden* analysis, the Court finds that documents or records relating to these incidents are "confidential law enforcement records." These items do relate to a "law enforcement matter of a criminal * * * nature," because they are directly related to the "investig[ation of] matters prohibited by state law." See *State ex rel. Polovischak v. Mayfield* (1990), 50 Ohio St.3d 51, 52–53, 552 N.E.2d 635, 636–638. And, see, *Snowden*, 75 Ohio St.3d at 143, 647 N.E.2d at 1378.

Regarding the second prong of the *Snowden* analysis, the Court finds that the documents or records referring to the two alleged incidents fall within the exception listed at R.C. 149.43(A)(2)(a), in that their release would create a high probability of disclosing the "identity of a suspect who has not been charged with the offense to which the record pertains." There is no dispute that the plaintiff was neither arrested nor charged in either incident. Contrary to the City's assertions otherwise, this exemption from public records is not lost with the passage of time or the fact that the identified individual has not been charged with a crime. *State ex rel. Moreland v. Dayton* (1993), 67 Ohio St.3d 129, 130, 616 N.E.2d 234, 235; *State ex rel. Sweeney v. Parma Hts.* (1994), 93 Ohio App.3d 349, 352, 638 N.E.2d 614, 616. One purpose behind this public records exception " * * * is to avoid the situation in which the release of confidential law enforcement investigation records would subject a person to adverse publicity where he may otherwise never have been identified with the matter under investigation." *Moreland* at 131, 616 N.E.2d at 236. Harm resulting from adverse publicity is precisely what the plaintiff claims in this case. Thus, the Court finds that documents or records contained in the plaintiff's background investigation file that pertain to the 1986 and 1987 Arizona sexual assault allegations are not public records within the purview of R.C. 149.43, and, therefore, potentially fall within the scope of R.C. 1347.10(A)(2).[8]

---

8. The Court notes that the plaintiff has not claimed that documents or ordinary records pertaining to the alleged Toledo domestic violence incident fit within this "uncharged suspect" exception to public records. The record fails to indicate whether the plaintiff was arrested or

The plaintiff also asserts that the background investigation file contained other documents/records "the release of which are prohibited by state or federal law." See R.C. 149.43(A)(1). He contends that the file contained "rap sheets" regarding his personal criminal history and that these "rap sheets" were derived from computerized criminal databases such as NORIS, LEADS and NCIC.[9] The following statutes and regulations prohibit the disclosure of such "rap sheets" to anyone outside of the law enforcement arena: R.C. 109.57(C); Ohio Adm.Code 4501:2–10–06(B); Subsections 3789g(b) and (c), Title 42, U.S.Code; Section 20.33(a)(3), Title 28, C.F.R.; and Section 50.12(b), Title 28, C.F.R. See *Snowden,* 72 Ohio St.3d at 144, 647 N.E.2d at 1378–1379. "Rap sheets" are not disclosable as public records and any references to such documents in other records must be redacted before disclosure. *State ex rel. Natl. Broadcasting Co. v. Cleveland* (1992), 82 Ohio App.3d 202, 206–207, 611 N.E.2d 838, 840–841.

The plaintiff asserts that his background investigation file contained such "rap sheets" when he first reviewed that file shortly before his appointment as a cadet. The parties have not provided the Court with the plaintiff's background investigation file or a complete copy thereof. Thus, the Court finds that the City has failed to prove as a matter of law that it is entitled to judgment on this issue.

### b. Second Main Argument

The City next argues that R.C. 1347.04(A)(1)(a) exempts actions by the Police Division from the coverage of, and the potential liability posed by, Ohio's Privacy Act. In relevant part that section reads as follows:

"(A)(1) Except as provided in division (A)(2) of this section * * * the following are exempt from the provisions of this chapter:

"(a) Any state or local agency, or part of a state or local agency, that performs as its principal function any activity relating to the enforcement of the criminal laws, including police efforts to prevent, control, or reduce crime or to apprehend criminals * * *."

---

charged in that matter. If he was arrested or charged in connection with that incident, records pertaining to the incident would not fall under the "uncharged suspect" exception. See *State ex rel. Outlet Communications, Inc. v. Lancaster Police Dept.* (1988), 38 Ohio St.3d 324, 328, 528 N.E.2d 175, 178–179. This question would need to be answered at trial.

**9.** "NORIS" is the Northwestern Ohio Regional Information System, "LEADS" is the Law Enforcement Automated Data System, and "NCIC" is the National Crime Information Center. (Plaintiff's Depo. pp. 16–17.) NORIS provides criminal history information for the Northwest Ohio area; LEADS provides such information statewide and is run by the State of Ohio; and NCIC is a nationwide system run by the FBI. *Id.*

The City, however, fails to address the impact of R.C. 1347.04(A)(2). In relevant part, R.C. 1347.04(A)(2) states as follows:

"A part of a state or local agency that does not perform, as its principal function, an activity relating to the enforcement of the criminal laws is not exempt under this section."

While most subdivisions within law enforcement agencies perform "activit[ies] relating to the enforcement of criminal laws," subdivisions in many law enforcement agencies perform only functions that fall outside of the law enforcement exemption of R.C. 1347.04(A)(2). 1987 Ohio Atty.Gen.Ops. 87–010. "If a part of a law enforcement agency does not perform, as its principal function, an activity relating to the enforcement of criminal laws, it must adhere to the provisions of R.C. Chapter 1347." *Id.*

In this case, the Police Division's Personnel and Fiscal Affairs Section operated the background investigation unit that conducted the candidates' background checks. (See Weigand Depo. pp. 5–7.) The background investigation files were then forwarded to the City's Human Resource Department for review and assessment. (*Id.* at 6.) Even when compiled by law enforcement agencies, background investigation reports used for the purposes of selecting future employees are not reports directly involving law enforcement. *Snowden,* 72 Ohio St.3d at 143, 647 N.E.2d at 1377–1378. Thus, the Court finds that neither the background investigation unit nor the Human Resource Department was principally engaged in an "activity relating to the enforcement of the criminal laws." Accordingly, the Court finds that R.C. 1347.04(A)(1) does not exempt the City from the coverage of R.C. Chapter 1347.

### c. Third Main Argument

The City next argues that it is not liable under R.C. Chapter 1347 because there is "no evidence that any City official in a position to make or set policy for the City authorized the release of the information in question." (Defendant's Memorandum in Support of Summary Judgment p. 11.) There is no dispute that the City established a set of policies and procedures to protect the confidentiality, and to prohibit the unauthorized release, of the contents of the background investigation files. (See defendants' Exs. E and F.)

For liability to attach under R.C. 1347.10(A)(2), a defendant must have "intentionally" disclosed "personal information" about the person claiming harm from the release. In relevant part, R.C. 1347.01(E) defines "personal information" as "any information that *describes anything about a person * * * and that contains * * * a name * * * or other identifier* assigned to a person." (Emphasis added.) Thus, to be successful, the plaintiff must prove that the City intentionally, rather

than negligently, disclosed information about him and that the disclosure identified him by name or other identifier.

The City contends that it should not be liable for the unauthorized acts of one or more unknown employees. The Court has discovered no Ohio authority describing the liability of a governmental entity, under the "intentional" disclosure provisions of R.C. 1347.10(A)(2), for an unauthorized disclosure of "personal information" by an employee. However, as a general rule, the doctrine of *respondeat superior* permits an employer to be held liable for the intentionally tortious acts of an employee only when those acts are done within the scope of employment. *Perry v. David* (Apr. 3, 1995), Clermont App. No. CA94–09–073, unreported, 1995 WL 141466. " 'Where an act has no relation to the conduct of the master's business, it may not be argued that the servant was acting upon his authority.' " *Miller v. Reed* (1986), 27 Ohio App.3d 70, 72, 27 OBR 89, 91, 499 N.E.2d 919, 921, quoting *Finley v. Schuett* (1982), 8 Ohio App.3d 38, 39, 8 OBR 41, 42, 455 N.E.2d 1324, 1325. See, also; *Reeves v. Bruner Corp.* (Sept. 20, 1990), Franklin App. No. 89AP–1419, unreported, 1990 WL 135869.

Courts describing the operation of the very similar Federal Privacy Act, Section 552a, Title 5, U.S.Code, have stated that the federal Act does not make the government strictly liable for disclosures. See *Albright v. United States* (C.A.D.C.1984), 732 F.2d 181, 189; *Rodgers v. Dept. of Army* (N.D.Ill.1988), 676 F.Supp. 858, 861.[10] Liability will attach only for "patently egregious and unlawful" acts. *Andrews v. Veterans Adm. of United States* (C.A.10, 1988), 838 F.2d 418, 425. Under the federal Act's "intentional or willful" standard, more than gross negligence is required. *Id.; Rodgers* at 861. Generally, prophylactic measures to protect individual privacy interests indicate an absence of intentional or willful conduct unless the facts indicate a "flagrant disregard" for privacy rights. *Sterling v. United States* (D.D.C.1993), 826 F.Supp. 570, 572.

There is a relevant difference between the operation of Ohio's Privacy Act and the Federal Privacy Act. A defendant may be liable under the Ohio Privacy Act only upon an "intentional" disclosure, while a defendant may be liable under the Federal Privacy Act for "intentional *or* willful" conduct. See R.C. 1347.10(A)(2); Section 552a(g)(4), Title 5, U.S.Code. "Intentional" conduct may be established by nothing short of "substantial certainty"; a defendant may be found to have "intended" a particular harmful result only where his/her behavior poses a substantially certain risk that harm will result. *Fyffe v. Jeno's, Inc.* (1991), 59 Ohio St.3d 115, 570 N.E.2d 1108, paragraph two of the syllabus. "Recklessness"

---

**10.** Section 552a(g)(4) permits an individual to collect damages from the federal government when the agency "acted in a manner which was *intentional or willful.*" (Emphasis added.)

is insufficient to constitute "intent." *Id.*[11] On the other hand, "willful" conduct (the type of behavior that may trigger liability under the Federal Privacy Act) may be evidenced by "reckless" behavior. *Ashtabula Cty. Med. Ctr. v. Douglass* (June 3, 1988), Ashtabula App. No. 1331, unreported, 1988 WL 59836.

After comparing the conduct required to trigger liability under both the federal and the Ohio Acts, the Court finds that the General Assembly intended that governmental entities may be liable only for "authorized disclosures." Thus, the Court concludes that under Ohio's Privacy Act, the City may be liable only for "authorized disclosures" by city employees and not for disclosures that were recklessly or negligently permitted.

In order to determine whether the City is entitled to summary judgment on this issue, the Court must review the disclosures identified by the plaintiff and those contained in the record. The Court has carefully sifted through the evidence presented by the parties. As mentioned above, the alleged improper disclosures of the three alleged criminal incidents took the form of (1) an untraced leak, or leaks, by City personnel triggering wide-spread rumors within the Police Division, (2) specific identified verbal or written disclosures, and (3) release of the plaintiff's background investigation file to The Blade.

### Leaks and Rumors

The evidence in this case fails to clearly indicate when the plaintiff's background information was first leaked, nor does it indicate by whom. The evidence also fails to indicate precisely when the rumors began to circulate. The first documented airing of rumors took place on December 5, 1990, at a meeting of the Northwest Ohio chapter of The Fraternal Order of Police. At that meeting, one or more individuals stated to the assemblage that several cadets had backgrounds that made them poor police officer candidates. (Weigand Depo. pp. 32–34.) These speakers did not mention any candidate by name. (*Id.*) These public statements described a cadet with rape charges, one with a disability, and one who was properly discharged from employment with a local law enforcement agency. (*Id.*)[12]

Based on the plaintiff's failure to link the untraced leak of information with the City's authorization therefor, and given that neither the leak nor the ensuing

---

**11.** While *Fyffe* is a case in which the Supreme Court of Ohio discusses an employer's liability for a workplace intentional tort, the Court finds the distinctions made by the "reckless" behavior not limited to that setting and applicable to this case.

**12.** The charges corresponded to items contained in the background files of the plaintiff and the other two of the three candidates discussed above.

rumors identified the plaintiff by name,[13] the Court finds that the City has proved entitlement to summary judgment for the plaintiff's Ohio Privacy Act claim based on unauthorized leaks and/or rumors.[14]

## Specific Verbal and Documentary Disclosures

The plaintiff asserts that numerous "authorized" officials of the City made improper verbal or documentary disclosures that would permit liability to be imposed pursuant to Ohio's Privacy Act. The plaintiff specifically identifies several such disclosures, and the record evidences others. The Court finds, however, that none of these disclosures should result in liability on the City under Ohio's Privacy Act. The Court will briefly address each identified disclosure and discuss why the City is not liable for it.

1. Verbal disclosure by Lt. Achter at December 12, 1990 F.O.P. meeting: there is no evidence that Achter was *authorized* to make any statement about the candidates' backgrounds (Weigand Depo. pp. 5–6, 24–26); Achter did not mention the plaintiff by *name* (Kachenmeister Depo. pp. 30–31).

2. Verbal disclosure by Captain Weigand to Mr. and Mrs. Lawrence Dyal at the December 6, 1990 City Council Safety Committee meeting: Captain Weigand did not mention the plaintiff by *name*. (Dyal Depo. p. 11.)

3. Verbal disclosure by Sergeant Moreland to the plaintiff mid-way through the plaintiff's academy training: Moreland spoke off-the-record (plaintiff Depo. pp. 49–50); thus, there is no evidence that the City *authorized* Moreland to make his statement.[15]

4. Verbal disclosure by Lt. Greenwood to his mother on or around December 4, 1990, and Ms. Greenwood's subsequent letter to then-Vice Mayor Carty Finkbeiner: there is no evidence that either Lt. or Ms. Greenwood was *autho-*

---

**13.** Apparently halfway through his academy training, the plaintiff's classmates deduced that the plaintiff was the individual alleged to have been involved in sexual assaults. (Plaintiff's Depo. p. 55.) They made this conclusion by comparing the ethnicity, marital status, civil service score, and number of negative background points of the "suspect" to these same attributes of the class members. (*Id.*)

**14.** This conclusion was influenced by the fact that the City had adopted, in the Court's view, reasonable policies and procedures to protect the promised confidentiality of the candidates during the background investigation and assessment portions of the selection process. (See defendants' Composite Exs. E and F.) Background file transfers were done by hand and tracking sheets were used. (Weigand Depo. p.14.)

**15.** The plaintiff alleges that Moreland said, "you're being scrutinized more than the other class members because of these allegations." (*Id.* at 50.)

*rized* to make statements; neither disclosure identified the plaintiff by *name*. (Greenwood Depo. pp. 9–12, 32.)

5. Verbal disclosure by Mr. Dyal to the Mayor's Task Force on or around December 11, 1990 (Dyal Depo. pp. 7–18): there is no evidence Dyal was *authorized* to make statements; he never mentioned the plaintiff by *name* (Captain Weigand never told Dyal the plaintiff's name). (*Id.*)

6. Verbal disclosures to The Blade and local television stations by anonymous "city sources" (see Kachenmeister Depo. Ex. 1 and pp. 15–17, 20): there is no evidence that *names* were used, that the sources were *authorized,* or who the sources were. (See *id.* at 20; Weigand Depo. pp. 19–20; Finkbeiner Depo. pp. 52–53; Zarecki Depo. p. 15; Moreland Depo. p. 8; Hoover Depo.)

7. Verbal disclosures by Messrs. Spradlin and Ferris (and unnamed others) to then-Vice Mayor Carty Finkbeiner in early December 1990: there is no evidence these individuals were *authorized* to make such statements and no evidence that the plaintiff's *name* was used. (Finkbeiner Depo. pp. 12–14, 17.)

8. Anonymous letters to then-Vice Mayor Carty Finkbeiner: there is no evidence that the authors were *authorized,* and the authors did not mention the plaintiff by *name.* (Weigand Jan. 2, 1991 Depo. Exs. 1 and 2.)

9. Verbal disclosure by Officer Zarecki to officemates after December 15, 1990 (Zarecki Depo. pp. 8–10): there is no evidence that Zarecki was *authorized,* and he did not mention the plaintiff by *name.* (*Id.*)

10. Verbal discussions among various City officials in early December 1990 (see Finkbeiner Depo. pp. 18–19, 39–40; Dyal Depo. pp. 18, 33; Hoover Depo. pp. 14–15): City officials were authorized to discuss the plaintiff's background and its relation to the selection process pursuant to a *release* the plaintiff signed prior to his selection (defendants' Ex. A [authorizing the "use" of background information "in the course of fulfilling (the City's) official responsibilities relative to (his) employment"]); problems arising with candidates in any selection process were properly and normally discussed in this fashion (see Hoover Depo. pp. 9, 14–15); there is no evidence that these discussions among City officials exceeded the scope of the release as they dealt with the plaintiff and the other two scrutinized candidates and their relationship to the selection process.

Accordingly, the Court finds that these above described "disclosures" did not violate Ohio's Privacy Act. The Court also finds that the plaintiff is unable to present evidence of other specific verbal and documentary disclosures (with the exception of a disclosure to The Blade of the background file discussed immediately below). Accordingly, the Court finds that the City is entitled to summary judgment as a matter of law on all claims that the City violated Ohio's Privacy Act by making specific verbal and documentary disclosures.

Disclosure of the Plaintiff's Background Investigation File to The Blade

The parties do not dispute that The Blade published two articles regarding the selection process and the controversy surrounding the three candidates. (See Kachenmeister Depo. Exs. 1 and 2 [which are copies of the December 13, 1990 and the January 6, 1991 articles, respectively].) Officer Kachenmeister testified that, based on the well-focused and knowledgeable questions posed to him by The Blade's reporter, The Blade had copies of the background files of the plaintiff and the other two candidates.[16] (*Id.* at 58–59.) Former City Manager Hoover testified that he believed that Ohio's Public Records Law required disclosure of portions of the background investigations files. (Hoover Depo. pp. 8–9.) Although it is not clear how The Blade obtained it, for purposes of this motion, the Court will infer that the City made an "authorized disclosure" of the plaintiff's background investigation file to The Blade.

It is also unclear whether the City disclosed the plaintiff's entire background investigation file to The Blade. As discussed earlier, to the extent the City disclosed criminal data base "rap sheets" and "confidential law enforcement investigatory records" regarding the plaintiff to The Blade, the City would be in violation of Ohio's Privacy Act. (See Section III.A.2.a., *supra.*) A factual determination, by either the Court or a jury, must resolve the question of whether improper materials were disclosed to The Blade along with the background investigation file. If the City did improperly provide protected materials to The Blade, the jury would need to determine if such an "authorized disclosure" "directly and proximately caused the harm" to the plaintiff and the extent of damage attributable to that disclosure.[17] R.C. 1347.10(A).

Accordingly, the Court finds that the City is entitled to summary judgment on all of the plaintiff's first claim against the City as follows:

ALL CLAIMS based on violations of Ohio's Privacy Act that arise out of leaks, rumors, and identifiable verbal and documentary disclosures EXCEPT FOR the plaintiff's claim, based on this legal theory, that arises out of any "authorized disclosure" by the City to The Blade of "rap sheets" or "confidential law enforcement investigatory records" contained in the plaintiff's background investigation file.

---

16. Officer Kachenmeister was one of three candidates under scrutiny by the City. (*Id.* at 17.)

17. That determination would be necessary in light of the preexisting harm caused by the leaks and rumors, the identifiable verbal and documentary disclosures, and their fallout, for which the City is not liable.

**B. SECOND CLAIM—THE CITY'S IMPROPER DISCLOSURES INVADED THE PLAINTIFF'S COMMON-LAW RIGHT OF PRIVACY**

In his second claim, the plaintiff argues that the City's alleged disclosures discussed above invaded his common law right to privacy. In *Housh v. Peth* (1956), 165 Ohio St. 35, 59 O.O. 60, 133 N.E.2d 340, paragraphs one and two of the syllabus, the Supreme Court of Ohio recognized that individuals have a right to privacy and a cause of action for invasion of that right by another.

"An actionable invasion of the right of privacy is the unwarranted appropriation or exploitation of one's personality, *the publicizing of one's private affairs with which the public has no legitimate concern,* or the wrongful intrusion into one's private activities in such a manner as to outrage or cause mental suffering, shame or humiliation to a person of ordinary sensibilities." (Emphasis added.) *Id.* at paragraph two of the syllabus.

The plaintiff contends that the City violated the so-called "publicity tort." See *Killilea v. Sears, Roebuck & Co.* (1985), 27 Ohio App.3d 163, 166, 27 OBR 196, 198–199, 499 N.E.2d 1291, 1293–1294. The elements of the publicity tort are as follows:

"(1) There must be publicity; the disclosure must be of a public nature, not private. * * *

"(2) The facts disclosed must be those concerning the private life of an individual, not his public life. * * *

"(3) The matter publicized must be one which would be highly offensive and objectionable to a reasonable person of ordinary sensibilities.

"(4) *The publication must have been made intentionally, not negligently.* * * *

"(5) The matter publicized must not be a legitimate concern to the public. * * *." (Emphasis added.) *Id.* at 166–167, 27 OBR at 199–200, 499 N.E.2d at 1294–1295. See, also, *Anthony v. Wonnell* (Apr. 7, 1992), Franklin App. No. 91AP–995, unreported, 1992 WL 230583.

In support of its motion for summary judgment, the City argues that it is immune from liability under this claim pursuant to R.C. Chapter 2744, the political subdivision immunity statute. The City contends that the statute fails to expressly permit litigants to bring intentional tort claims against political subdivisions, such as the City. See *Farra v. Dayton* (1989), 62 Ohio App.3d 487, 497, 576 N.E.2d 807, 813–814 (because R.C. Chapter 2744 fails to expressly permit intentional tort claims against a political subdivision, such claims are barred).

The Court notes, however, that R.C. 2744.09(B) permits "[c]ivil actions by an employee * * * against his political subdivision relative to any matter that arises

out of the employment relationship between the employee and the political subdivision[.]" See *Whitehall ex rel. Wolfe v. Ohio Civ. Rights Comm.* (1995), 74 Ohio St.3d 120, 122–123, 656 N.E.2d 684, 686–688; *Nungester v. Cincinnati* (1995), 100 Ohio App.3d 561, 566, 654 N.E.2d 423, 426–427; *Applegate v. Weadock* (Nov. 30, 1995), Auglaize App. No. 2–95–24, unreported, 1995 WL 705214. . Thus, the Court finds that R.C. Chapter 2744 does not provide the City with immunity from liability for claims arising under the common law privacy tort because the claims arise out of the plaintiff's employment with the City.

The City next argues that there is no evidence that it invaded the plaintiff's privacy because the City is not liable for the unauthorized acts of third parties and because the matter is subject to disclosure under Ohio's Public Records Law as it is a matter of public concern.

The Court agrees that the City is not liable to the plaintiff for unauthorized disclosures by employees or other third parties. (See Section III.A.2.c., *supra.*) But, here, the City may be liable for an "authorized disclosure" of the plaintiff's background investigation file to The Blade if the disclosed file contained "rap sheets" and "confidential law enforcement investigatory records"; such documents are not public records and therefore not properly of public concern. (See Section III.A.2.a., *supra.*) The City would not be liable, however, for the release of other documents in that file that are public records. (See *id.*)

Accordingly, the Court finds that the City is entitled to summary judgment on the plaintiff's second claim against the City as follows:

ALL CLAIMS based on the common-law tort of invasion of privacy that arise out of leaks, rumors, and identifiable verbal and documentary disclosures EXCEPT FOR the plaintiff's claim, based on this legal theory, that arises out of any "authorized disclosure" by the City to The Blade of "rap sheets" or "confidential law enforcement investigatory records" contained in the plaintiff's background investigation file.

C. THIRD AND FOURTH CLAIMS—THE CITY'S IMPROPER DISCLOSURE INVADED THE PLAINTIFF'S CONSTITUTIONAL RIGHT TO PRIVACY AND DENIED HIM OF SUBSTANTIVE AND PROCEDURAL DUE PROCESS RIGHTS

In his third claim, the plaintiff asserts that alleged improper disclosures violated his federal constitutional right to privacy. In his fourth claim, he asserts that those alleged disclosures violated his substantive and procedural due process

rights. He bases his right to recovery in both claims upon Section 1983, Title 42, U.S.Code ("Section 1983").[18]

To state a claim under Section 1983, an individual must prove that a defendant deprived the individual of a right protected by the United States Constitution and that the defendant acted under the color of state law at the time. *Roe v. Hamilton Cty. Dept. of Human Serv.* (1988), 53 Ohio App.3d 120, 123, 560 N.E.2d 238, 240–241; *Doe v. Wigginton* (C.A.6, 1994), 21 F.3d 733, 738. A governmental entity cannot be liable under Section 1983 based solely on the doctrine of *respondeat superior.* *Monell v. Dept. of Social Services of City of New York* (1977), 436 U.S. 658, 690–691, 98 S.Ct. 2018, 2035–2036, 56 L.Ed.2d 611, 635–636; *Soucie v. Monroe Cty. Probation Dept.* (W.D.N.Y.1990), 736 F.Supp. 33, 38. Section 1983 liability may be based on conduct that was expressly authorized by the entity. See *Shirshekan v. Hurst* (D.C.Ill.1987), 669 F.Supp. 238, 242. The entity may also be liable under Section 1983 for the deprivation of a constitutional right when the deprivation arises from a governmental "custom" or "policy." *Monell* at 690–691, 98 S.Ct. at 2035–2036, 56 L.Ed.2d at 635–636; *Soucie* at 38. Additionally, the governmental entity may be liable under Section 1983 for harm caused by a specific unauthorized disclosure if the entity had failed to investigate previous similarly harmful and unauthorized disclosures. *Id.* at 38.

As it did in regard to the first and second claims, the City argues that it is entitled to summary judgment on the Section 1983 claims asserted here because it made no "authorized disclosure" of the plaintiff's confidential personal information.

In this case, there is no evidence of a City "policy" or "custom" permitting unauthorized disclosures of background information; the City was actually operating under a policy of confidentiality at the time. (See defendants' Exs. E and F.) Additionally, there is no evidence that previous selection processes resulted in leaked information or that the City had failed to investigate any such prior outflow. Thus, the Court finds that the City would not be liable under Section 1983 for any leak, or rumor, or any specific unauthorized verbal or documentary disclosure. However, the City may be liable for the allegedly "authorized disclosure" of the plaintiff's background investigation file to The Blade.

---

**18.** Section 1983 reads in pertinent part as follows:

. "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any state or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other persons within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. * * * "

Regarding the third claim specifically, the City argues that there is no general constitutional right to privacy regarding the disclosure of confidential private information. In support of this proposition, the City cites *Jarvis v. Wellman* (C.A.6, 1995), 52 F.3d 125, 126; *Doe v. Wigginton,* 21 F.3d at 740; *J.P. v. DeSanti* (C.A.6, 1981), 653 F.2d 1080, 1090–1091. See, also, *Paul v. Davis* (1976), 424 U.S. 693, 713–714, 96 S.Ct. 1155, 1166–1167, 47 L.Ed.2d 405, 420–422 (no federal privacy right in the protection of one's reputation).

In *State ex rel. Beacon Journal Publishing Co. v. Akron* (1994), 70 Ohio St.3d 605, 640 N.E.2d 164, however, the Supreme Court of Ohio recognized a federal constitutional right to privacy that protects against governmental disclosure of the private details of one's life. *Id.* at 608, 640 N.E.2d at 166–167. The *Beacon Journal* court based its decision on language in the case of *Whalen v. Roe* (1977), 429 U.S. 589, 97 S.Ct. 869, 51 L.Ed.2d 64. The *Whalen* court stated:

"The cases sometimes characterized as protecting 'privacy' have in fact involved at least two different kinds of interests. *One is the individual interest in avoiding disclosure of personal matters,* and another is the interest in independence in making certain kinds of important decisions." (Emphasis added; footnotes omitted.) *Id.* at 598–600, 97 S.Ct. at 876, 51 L.Ed.2d at 73.

See, also, *Nixon v. Admr. of Gen. Services* (1977), 433 U.S. 425, 457, 97 S.Ct. 2777, 2797, 53 L.Ed.2d 867, 899–900. Other Ohio courts have also acknowledged this constitutional right to privacy that covers sensitive personal information. See *State ex rel. Plain Dealer Publishing Co. v. Cleveland* (1996), 75 Ohio St.3d 31, 34, 661 N.E.2d 187–190; *Arnold v. American Natl. Red Cross* (1994), 93 Ohio App.3d 564, 580, 639 N.E.2d 484, 494–495; *Wilson v. Patton* (1988), 49 Ohio App.3d 150, 155, 551 N.E.2d 625, 629–630.

The *Beacon Journal* court set forth a two-step analysis for determining whether a governmental entity invaded an individual's constitutional right to informational privacy: (1) does the aggrieved party have a legitimate expectation of privacy in the information and (2) does his or her privacy interest outweigh the benefit to society derived from disclosure? *Id.* at 608, 640 N.E.2d at 166–167. In *Beacon Journal,* the court determined that the Federal Privacy Act created a reasonable expectation of privacy in the protection of social security numbers belonging to public employees. *Id.* at 609, 640 N.E.2d at 167–168 (Social Security numbers are not public records for purposes of R.C. 149.43).

Regarding the first step of the *Beacon Journal* analysis, we have already determined that "rap sheets" and "confidential law enforcement investigatory records" are not public records, but rather they are protected from disclosure by state law. Thus, the Court finds that the plaintiff had a reasonable expectation of privacy in the confidentiality of any such documents contained in the copy of his

background investigation file allegedly disclosed by the City to The Blade. See *Wilson*, 49 Ohio App.3d at 154–155, 551 N.E.2d at 628–630 (the plaintiff stated a Section 1983 claim for invasion of his constitutional privacy rights for disclosure of medical records because medical records are not "public records").

Having concluded that the plaintiff had a reasonable expectation of privacy in some of the documents allegedly disclosed to The Blade, the Court must now address the second step outlined in *Beacon Journal*. The Court finds that whether the plaintiff's privacy interest outweighs the benefit of public disclosure is a matter best left for the trier of fact. Assuming the City did disclose a copy of the plaintiff's background investigation file to The Blade, and assuming that the copy contained "rap sheets" and other confidential records, the jury would need to ascertain the reason for the disclosure of those records and weigh any public benefit against any harm caused to the plaintiff. See *id.* at 610–611, 640 N.E.2d at 168–169; *Wilson* at 155, 551 N.E.2d 625, Thus, the Court finds that summary judgment is not proper on the portion of the plaintiff's third claim relating to the City's "authorized disclosure" of the plaintiff's background file to The Blade.

Regarding the plaintiff's fourth claim, the plaintiff argues that the City violated his substantive and procedural due process rights by allegedly disclosing confidential personal information without his permission. The City contends, and the plaintiff does not dispute, that the plaintiff's "substantive due process" claim is based on, and coextensive with, the constitutional right of privacy claim. (See the City's Memorandum p.20.) Thus, the Court finds that the analysis applied to the constitutional privacy claim also applies to the substantive due process claim. Accordingly, the Court finds that, to the same extent as in the third claim, summary judgment is not proper on this portion of the plaintiff's fourth claim.

Regarding the plaintiff's procedural due process claim, the Court must determine whether the City deprived the plaintiff of any "liberty" or "property" interest contained in the confidential background information without due process of law. *Sean R. v. Bd. of Edn. of Woodbridge* (D.C.Conn.1992), 794 F.Supp. 467, 469; *Paul v. Davis*, 424 U.S. at 710–712, 96 S.Ct. at 1164–1166, 47 L.Ed.2d at 419–420. Procedural guarantees apply whenever a state seeks to remove or significantly alter individual interests that are protected by law. *Id.* at 711, 96 S.Ct. at 1165, 47 L.Ed.2d at 419–420; *Sean R.* at 469. A person's reputation alone enjoys no such protection. See *Paul* at 712, 96 S.Ct. at 1165–1166, 47 L.Ed.2d at 420. But an individual does have a "liberty" interest in any confidential personal information that is protected by law from disclosure. *Sean R.* at 469.

In this case, as discussed earlier, "rap sheets" and "confidential law enforcement investigatory records" are protected from disclosure by state and federal law. Thus, the Court finds that the plaintiff has a "liberty" interest in these. To the extent that the City made "authorized disclosures" of any of these documents to The Blade, the City may have deprived the plaintiff of a "liberty" interest without due process of law. The Court, therefore, denies summary judgment as to this claim.

Based on the foregoing, the Court finds that the City is entitled to summary judgment on the plaintiff's third and fourth claims against the City as follows:

ALL CLAIMS based on violations of the plaintiff's federal constitutional rights that arise out of leaks, rumors, and identifiable disclosures EXCEPT FOR the plaintiff's claims, based on these legal theories, that arise out of any "authorized disclosure" by the City to The Blade of "rap sheets" or "confidential law enforcement investigatory records" contained in the plaintiff's background investigation file.

## D. FIFTH CLAIM—INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

The plaintiff also contends that the defendants are liable to him for intentionally inflicting emotional distress. This tort has been recognized by the Supreme Court of Ohio, in *Yeager v. Local Union 20* (1983), 6 Ohio St.3d 369, 6 OBR 421, 453 N.E.2d 666, syllabus.

"One who by extreme and outrageous conduct intentionally or recklessly causes serious emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm. * * *." (Citation omitted.) *Id.*

In explaining the tort, the *Yeager* court quoted the Restatement of the Law 2d, Torts (1965), 73, Section 46, Comment *d*, which reads as follows:

"It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. *Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.* * * *." (Emphasis added.)

Plaintiffs in our society are expected to be able to endure "a certain amount of rough language, and * * * occasional acts that are definitely inconsiderate and unkind." *Yeager, supra,* 6 Ohio St.3d at 375, 6 OBR at 426, 453 N.E.2d at 671.

In this case, as discussed earlier, the plaintiff is unable to present clear evidence on any specific "authorized disclosures" of the plaintiff's background information by the City except for the alleged disclosure to The Blade. Thus, the Court finds that the plaintiff is also unable to present any evidence of the extreme and outrageous conduct necessary for the City's liability on the plaintiff's claim for intentional infliction of emotional distress. Additionally, because Captain Weigand's statement to Mr. and Mrs. Dyal did not mention the plaintiff's name, the Court finds that the statement also does not rise to the level of "extreme or outrageous." Accordingly, the Court finds that the City and Captain Weigand are entitled to summary judgment on this claim as a matter of law.

## JUDGMENT ENTRY

It is ORDERED that the motion for summary judgment filed by defendants the City of Toledo and James Weigand is granted in part and denied in part.

It is further ORDERED that the plaintiff's claims against the City of Toledo and James Weigand for violations of the Federal Privacy Act are dismissed with prejudice.

It is further ORDERED that the following claims of the plaintiff asserted against the City of Toledo are dismissed with prejudice to the extent expressed below:

ALL CLAIMS based on (1) violations of Ohio's Privacy Act, (2) the common-law tort of invasion of privacy, and (3) violations of the plaintiff's constitutional rights, that arise out of leaks, rumors, or identifiable verbal and documentary disclosures EXCEPT FOR the plaintiff's claims, based on these three legal theories, that arise out of any authorized disclosure by the City of Toledo to The Toledo Blade Company of "rap sheets" and/or "confidential law enforcement investigatory records" contained in the plaintiff's background investigation file.

It is further ORDERED that the plaintiff's claims against the City of Toledo and James Weigand for intentional infliction of emotional distress are dismissed with prejudice.

April 22, 1996

IN THE COURT OF COMMON PLEAS OF LUCAS COUNTY, OHIO

Patrolman "X," Plaintiff,

vs.

City of Toledo et al., Defendants.

Case No. CI94–2884

OPINION AND JUDGMENT ENTRY

CHARLES J. DONEGHY, Judge.

This refiled case is before the Court on the motion of defendant James W. Weigand ("Weigand") for summary judgment.[1] In this action, the plaintiff, Patrolman "X," alleges that in late December 1990 or early 1991 the defendants, the City of Toledo ("the City") through its Police Division, Weigand, and John and Jane Doe, permitted confidential information pertaining to him to be made public thereby causing him various personal and professional injuries. Upon review of the pleadings, memoranda of counsel, and applicable law, the Court finds that it must grant Weigand's motion.

I

In December 1990, the plaintiff was selected to be a part of the December 1990 class of new recruits to the City's Police Division. On December 3, 1991, the plaintiff filed the original action alleging that the City and John and Jane Doe, through unprivileged disclosure of his confidential personal information, violated R.C. Chapter 1347 (First and Second Claim) and Section 1983, Title 42, U.S.Code (Third and Fourth Claim), and did so in an intentional and wilful fashion (Fifth Claim). On October 28, 1993, the plaintiff amended his complaint to rename Weigand who had originally been sued under the fictitious name "John Doe." The plaintiff filed a second amended complaint in early 1994 and added a claim for intentional infliction of severe emotional distress.

In his motion for summary judgment, Weigand seeks judgment on all but the intentional infliction of emotional distress claim.[2] Weigand contends that the

---

**1.** The case was originally filed as Case No. CI91–3928. On or about September 27, 1994, by Stipulation of Dismissal, the parties agreed that the plaintiff could dismiss and refile this matter.

**2.** The omission of that claim from his motion for summary judgment appears to have been inadvertent. Nonetheless, the Court's review is limited by scope of Weigand's motion. See *Mitseff v. Wheeler, infra.*

claims against him, raised in the first amended complaint of Case No. CI91–3928 and therefore the instant action, are time-barred.

## II

To succeed on a Civ.R. 56(C) motion for summary judgment, the movant must demonstrate:

"(1) that there is no genuine issue as to any material fact; (2) that the moving party is entitled to judgment as a matter of law; and (3) that reasonable minds can come to but one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made, who is entitled to have the evidence construed most strongly in his favor." *Harless v. Willis Day Warehousing Co.* (1978), 54 Ohio St.2d 64, 66, 8 O.O.3d 73, 74, 375 N.E.2d 46, 47.

Where the movant has made this tripartite showing, summary judgment is appropriate. *Id.* A motion for summary judgment may force the nonmovant to produce evidence on an issue for which she bears the burden of production at trial. *Wing v. Anchor Media, Ltd. of Texas* (1991), 59 Ohio St.3d 108, 570 N.E.2d 1095, paragraph three of the syllabus. The movant may shift the burden of production to a nonmovant by pointing to an element missing from the nonmovant's case. *Mitseff v. Wheeler* (1988), 38 Ohio St.3d 112, 114–115, 526 N.E.2d 798, 800–801.

## III

Initially, the Court notes that the parties agree that R.C. Chapter 1347 and Section 1983 are both governed by two-year statutes of limitations. They also agree that the causes of action involved here arose in December 1990 or early 1991. Thus, the applicable limitations periods ran in early 1993, at the latest.[3] The issue in this case is whether the amended complaint against Weigand filed in October of 1993 relates back to the filing of the original complaint, in December 1991, to avoid the time bar of the applicable statutes of limitations.

The timeliness of the claims against Weigand is governed by Civ.R. 3(A), 15(C), and 15(D). *Amerine v. Haughton Elevator Co.* (1989), 42 Ohio St.3d 57, 537 N.E.2d 208, syllabus. These rules are to be read in conjunction with one another when attempting to determine "if a previously unknown, now known, defendant has been properly served so as to avoid the time bar of an applicable statute of limitations * * *." *Id.* Civ.R. 3(A) provides as follows:

---

3. Assuming that the Fifth Claim from CI91–3928 (now the Sixth Claim) asserts a proper cause of action, the plaintiff does not dispute that the limitation for that "intentional" conduct claim is one year.

"(A) Commencement. A civil action is commenced by filing a complaint with the court, *if service is obtained within one year from such filing* upon a named defendant, or upon an incorrectly named defendant whose name is later corrected pursuant to Rule 15(C), or *upon a defendant identified by a fictitious name whose name is later corrected pursuant to Rule 15(D)."* (Emphasis added.)

Civ.R. 15(D) sets forth the requirements for properly amending a complaint to add the name of a defendant, previously sued under a fictitious name such as "John Doe," when that defendant's true identity becomes known to a plaintiff. *Id.* at 59, 537 N.E.2d at 209–210. Among the requirements are: the plaintiff must amend the complaint upon discovery of the defendant's true name; the summons must contain the words "name unknown"; and the defendant must be personally served. Civ.R. 15(D).[4] Civ.R. 15(C) permits an amended complaint to relate back to the date of the original pleading when "the claim * * * asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading * * *." Civ.R. 15(C).

The *Amerine* opinion is instructive on the issue now facing the Court:

"Civ.R. 3(A) now specifically states that the use of a fictitious name with subsequent correction, by amendment, of the real name of a defendant under Civ.R. 15(D) relates back to the filing of the original complaint and that *service must be obtained within one year of the filing of the original complaint.* Under Civ.R. 3(A), as amended, service does not have to be made on the formerly fictitious, now identified, defendant within the statute of limitations as long as the original complaint has been filed before the expiration of the statute of limitations." (Emphasis added.) *Id.,* 42 Ohio St.3d at 59, 537 N.E.2d at 210.

See, also, *Evans v. Cleveland* (Feb. 20, 1992), Cuyahoga App. No. 59940, unreported, 1992 WL 30950. Thus, in order to have properly commenced this action against Weigand, the plaintiff would have had to amend the complaint and properly name Weigand within one year of the filing of the original complaint, in December 1992, or before the statute of limitations ran, in December 1992 or early 1993. See *id.* Because he failed to do so, but instead amended some ten months later, the plaintiff's action against Weigand is barred as to all of the claims upon which Weigand now seeks summary judgment.[5] Thus, Weigand's motion for summary judgment shall be granted.

---

4. A Civ.R. 15(D) amendment does not "change" a party as contemplated by the latter portion of Civ.R. 15(C). *Amerine, supra,* 42 Ohio St.3d at 59, 537 N.E.2d at 209–210.

5. Again, Weigand has not sought summary judgment on the intentional infliction of severe emotional distress claim.

## JUDGMENT ENTRY

It is ORDERED that the motion for summary judgment filed by defendant James W. Weigand hereby is granted. It is further ORDERED that the plaintiff's complaint, with the exception of the intentional infliction of severe emotional distress claim, is dismissed as to that defendant with prejudice.

March 30, 1995